SNYDER et al.
v.
UNITED STATES.

GUYER et al.
v.
UNITED STATES.

BAIR, Adm'r v. UNITED STATES.

SNYDER, Adm'r
v.
UNITED STATES (two cases).

SNYDER
v.
UNITED STATES (two cases).

Nos. 5615, 5871, 5889, 6096–6099.

United States District Court,
D. Maryland.

Dec. 23, 1953.

Venable, Baetjer & Howard, Baltimore (Norwood B. Orrick & Richard W. Emory, Baltimore, Md.) for plaintiffs in Nos. 5871 and 5889.

Piper & Marbury, Baltimore (Jesse Slingluff, Jr., and Frank T. Gray, Baltimore, Md.,) for plaintiffs, in No. 5615.

John Geyer Tausig, Washington, D. C., for plaintiffs in Nos. 6096, 6097, 6098 and 6099.

George Cochran Doub, U. S. Atty., and James B. Murphy, Asst. U. S. Atty., Baltimore, Md., for the United States.

WILLIAM C. COLEMAN, Chief Judge.

These seven suits involve claims against the Government under the Federal Tort Claims Act, 28 U.S.C.A. § 1346 (b), and arise out of a tragic accident which occurred on the afternoon of April 8, 1951, at Morningside, near Andrews Field, in Prince George's County, Maryland, resulting in the death of three persons and serious injuries to three others.

The accident was the result of the abandonment of a B-25 Bomber plane of the United States Government, stationed at Andrews Field. The plane was being given a test flight with respect to the operation of its landing gear, with a pilot, co-pilot and engineer aboard. Difficulty was found with respect to the retracting and release of the landing gear. All of the customary procedures were tried with a view to overcoming the difficulties but without success. The pilot was in almost constant radio contact with the tower at Andrews Field. A crash landing was determined not to be feasible, since, due to the condition of the landing gear, such would have been extremely dangerous, if not fatal, to all three occupants of the plane. After the plane had been in flight several hours and was near Annapolis, about thirty miles distant from Andrews Field, the gas supply running low and with little hope of repairing the landing gear, the pilot decided to return to Andrews Field for further instructions. On nearing the field, the pilot reported that he planned to abandon the plane and requested instructions from the tower as to a proper heading so that he would miss the populated area. The tower replied, as a result of consultation between six superior officers of the Air Force who had assembled in the tower, that if still unsuccessful in getting the landing gear to operate properly, then the plane should be flown directly over the field, the co-pilot and engineer to bail out on the first pass and the pilot to do the same on the second pass over the field on a heading of 120°. These directions were followed

and both pilots and engineer landed safely with only minor injuries. The object in setting the course of the abandoned plane as was done, was that it would proceed in a general southeasterly direction towards the Chesapeake Bay, about 15 miles distant and which would be reached in normal flight in 7 or 8 minutes. Simultaneously, the tower gave orders for two Jet planes to pursue the abandoned B–25 and to shoot it down over the Bay. However, the unexpected happened. The plane proceeded only a very short distance on the course as set; then began to circle to the left and finally crashed about 200 feet from the home of Samuel and Dorothea Snyder, at Morningside, struck the house with great force, set it on fire and completely destroyed it. At the time, Irvin N. Guyer and his wife, Violet S. Guyer, sister of Mr. Snyder, were paying a visit in the Snyder home. Irvin N. Guyer was pinned in the wreckage and died of suffocation after efforts at rescue failed. His wife was seriously injured, as were also Mr. and Mrs. Snyder, whose two minor children were killed. The pilot was indicted, and tried for manslaughter, and was found not guilty. No. 22145 Criminal Action, in this Court.

All of the seven claims of the various plaintiffs have been brought under the Federal Tort Claims Act, 28 U.S.C.A. § 1346(b). The United States Government admits liability in the first five cases (Nos. 5615, 5871, 5889, 6096 and 6097). In No. 6098 in which Dorothea Snyder is plaintiff, Government counsel first asserted that any right of recovery that she or her husband might have for property damage was exclusively under the Military Personnel Claims Act, 31 U.S.C.A. § 222c. But this defense was declared unavailable to the Government because not seasonably asserted, and primarily because that Act is not by its express terms applicable to the present case, since the house which was destroyed, together with personal property, was not quarters "assigned" to Mrs. Snyder's husband incident to his military service. See Fidelity-Phenix Fire Ins. Co. v. United States,

D.C., 111 F.Supp. 899. Thus, this Court held that Mrs. Snyder was not barred under the Federal Tort Claims Act as respects both property damage and personal injuries. This Court made a similar ruling, also at the beginning of this proceeding, with respect to the suit (No. 6099) of the husband, Master Sergeant Samuel R. Snyder. However, as respects his claim for personal injuries, the Government denies he has any right of recovery under the Federal Tort Claims Act because, as claimed, he was on military duty at the time he was injured. In these two suits, the Government also contests the amount of damages claimed. In the other five cases, the amount of damages is the sole issue.

The suits will be taken up in chronological order, according to their docket numbers, and the first is case No. 5615, brought by the Snyders to the use of the Travelers Fire Insurance Company, which insured their home in the amount of $7,000.00. The damage to the Snyder home was, we find, by the weight of the credible evidence, considerably in excess of the total amount of the coverage which was paid by the Travelers Insurance Company. Thus, it is entitled to recover the full amount of the policy that it paid, namely, $7,000.00. The insurance company's right of subrogation under the established facts is clear. See Fidelity-Phenix Fire Insurance Co. v. United States, supra. In order to retain the chronological sequence in considering these various cases, the damages to be allowed the Snyders for the destruction of their home, in addition to recovery on this subrogation claim allowed the insurance company, will be considered in due course under cases numbered 6098 and 6099.

We next turn in sequence to case number 5871, namely, the suit brought by Mrs. Guyer under Sections 1–6 incl. of Article 67 of the Annotated Code of Maryland, 1951, for the use of herself and her three infant children, by reason of the wrongful death of her husband, Irvin N. Guyer. In this same suit there have been included claims for (1) per-

sonal injuries suffered by Mrs. Guyer; and (2) medical expenses which she incurred and her personal property loss.

Considering first the pecuniary loss to Mrs. Guyer and the three minor children as the result of her husband's death, the material and undisputed facts bearing upon this phase of the case are the following: Guyer was 37 years, 6 months and 10 days old, and his wife 36 years, 4 months old, when he was killed; they were married on May 18, 1939, and their three children, the equitable plaintiffs, were of the following ages at the time their father was killed: Joyce Elaine Guyer, 9 years, 8 months; Frederick Irvin Guyer, 7 years, 7 months: and Roslyn Marie Guyer, 5 years, 4 months. Both parents and all of the children enjoyed, up to the time of their father's death, good health, with normal life expectancies. The father had been approved for life insurance as recently as January, 1951. The Guyer's married life had been continuously harmonious. He had proved a good husband, father and provider for his family. He had been successful in his business as an automobile dealer. His earnings from January 1, 1947, to the date of his death were approximately as follows: 1947 $16,000; 1948 $9,500; 1949 $10,500; 1950 $10,200; 1951 (3 months) $17,000. He had no invested income. Mrs. Guyer testified that her husband, during the above period, expended out of his earnings from $600 to $700 a month for the support of herself and the three children.

■ It is appropriate in cases of this kind, for the purpose of establishing the measure of damages, to rely upon established mortality tables to prove the joint life expectancy of the survivors entitled to be compensated for the wrongful death. Scott v. James Gibbons Co., 192 Md. 319, 64 A.2d 117. Such tables were introduced in the present case, being the United States Life Tables and Actuarial Tables, 1939–41, used by the Government for computing the value of life and remainder interests for the purpose of Federal estate and gift taxes. Testimony was also given by an actuary based on these tables, which showed that the joint life expectancy of Mr. and Mrs. Guyer was 26.84 years at the time of his death. The further testimony of the actuary was undisputed that $18.50 invested at 3% is required to yield $1.00 a year for 26.84 years, and that the amount of money required to reimburse Mrs. Guyer and the three minor children for the loss of support and maintenance of her husband and their father, during the 26.84 years of joint life expectancy, is, if considered on the basis of approximately $600.00 monthly support by the father, $138,750.00, and if considered on the basis of approximately $700.00 monthly support, $157,250.00. In other words, it was testified that if $138,750.00 is invested at 3%, it will produce $7500.-00 a year for 26.84 years, and if $157,250 is similarly invested, it will produce $8500.00 a year for 26.84 years, provided in each case the principal is consumed in the process so that at the end of the period, there is nothing left.

Breaking down the above figure of $138,750.00 which is computed on the basis of an annual expectancy contribution of $7500.00 annually by the husband for the support of his wife and children, with due regard to the children's ages, the following figures were given on behalf of Mrs. Guyer as representing the proper distribution of the total sum of $138,750.00: $98,650 to the wife; to the oldest child, $11,850, to the next oldest $13,400, and to the youngest $14,850. Evidence was introduced in support of the claim that 3% is a fair and proper rate of interest to use in making this computation since it is a return that is to be expected from the best and safest investments. Reliance was had upon Chesapeake & Ohio Railway v. Kelly, 241 U.S. 485, at pages 490–491, 36 S.Ct. 630, 632, 60 L.Ed. 1117, in which the Supreme Court said that the rate of interest obtainable upon safe investments should be adopted "in computing the present value of the future benefits; it being a matter of common knowledge that, as a rule, the best and safest investments, and those which require the least

care, yield only moderate return." See also Affolder v. New York, Chicago & St. Louis Ry. Co., 339 U.S. 96, 70 S.Ct. 509, 94 L.Ed. 683, Id., D.C., 79 F.Supp. 365, 368, Id., 8 Cir., 174 F.2d 486. It was further disclosed that the United States Government uses a 3½% rate of interest in computing the present value of life and remainder interests for Federal estate and gift taxes.

■■ We do not understand from the decisions that there is, nor can there correctly be any rigid rule as to the precise rate of interest that must be uniformly adopted in making computations of this kind. We are disposed to the view that a rate of 3½% is, all things considered, the more appropriate rate in the present instance. Using this rate and adopting $7500.00 as the annual support by the father to which the wife and the children would reasonably be entitled, upon the basis that she may reasonably be expected to live out her and her husband's joint life expectancy of 26.84 years, and the children to live to majority, the amounts which should justly be awarded to them in the present suit are as follows: to the mother $92,100.00, to the first child, $11,600.00, to the second child $13,100.00, to the youngest child $14,450.00, or a total of $131,250.00.

Counsel for the Government has strongly protested against the allowance of so large an amount, claiming that it is not only unjustified on the facts in the present case but that there is no precedent for such an allowance under the Maryland death statute. Reliance is placed by the Government upon Baltimore Transit Co. v. For Use of Castranda, 194 Md. 421, 71 A.2d 442, where recovery was limited to $30,000.00 to the widow; $3250.00 to a 14 year old child; $3500.00 to one 13 years old; $6000.00 to one 9 years old and $7250.00 to one 6 years old.

While the present case is based upon the Maryland statute, that statute does not purport, either expressly or impliedly, to determine the amount of damages to be allowed to a wife and minor children for the wrongful death of her husband. Each case must be determined upon its own precise facts and circumstances, in the light of existing conditions, and the value of the dollar which today is far below what it was even a few years go. Taking all of these factors, therefore, into consideration, we believe that compensation in the total amount of $131,250.00 is proper and just in the present case, and it will be allowed.

■ We turn now to the question of damages to be allowed in the second branch of this case No. 5871, namely, that involving the personal injuries to Mrs. Guyer. The weight of the credible testimony establishes these injuries to have been as follows: left arm contusion with severely damaged muscles and nerves which resulted in considerable impairment of the full use of the arm. This disability still persists, although there was no fracture. There were numerous deep cuts on the face and body, scars from some of which on the face are still apparent. There were many severe contusions on various parts of the body, including chest and breasts, and pieces of glass and other foreign substances imbedded in various parts of the body which had to be removed. While no bones were broken, hospitalization of several weeks resulted, and the plaintiff still suffers from severe headaches, and is considerably under-weight and highly nervous. It is very difficult if not impossible to estimate accurately the present extent of plaintiff's mental and physical disability, and to say what, if any, part of it will be permanent. However, Mrs. Guyer's principal physician who has treated her regularly since she was injured, and whose testimony appeared to the Court to be entirely trustworthy, stated that he seriously doubted whether plaintiff would ever again be able to perform fully and satisfactorily the duties of a registered trained nurse, which she had done before her marriage but not since. There is no evidence that she would like to take up her profession again. Unquestionably the grief, depression and debility from which the plaintiff has suffered and continues to suffer,

because of the loss of her husband under such tragic, shocking circumstances, have aggravated the actual bodily injuries and the extreme shock which she suffered when the plane crashed into the house where she was visiting her brother and as a result, she was buried under the wreckage and remained for some minutes in a semi-conscious condition until removed to a hospital. The law, nevertheless, does not permit the Court to allow damages to the plaintiff as compensation for such grief, depression and debility per se.

On behalf of Mrs. Guyer it is contended that for the aforegoing injuries, both physical and mental, she is entitled to the sum of $30,000.00. On the other hand, the Government contends that adequate and just compensation for these injuries does not exceed the sum of $10,000.00. It is unnecessary to dilate further upon the character of Mrs. Guyer's injuries and of her great physical and mental suffering. We feel that the aforegoing analysis of them is sufficient to indicate that they were very great. We, therefore, feel that the amount contended for by her counsel is just compensation and will accordingly be allowed.

There remains to be considered under case No. 5871 its third branch, namely, the amount to be allowed Mrs. Guyer for medical expenses and personal property loss. The first item, undisputed because supported by vouchers, comes to $2715.59. The second item, comes to $346.30 and appears to be fairly computed. Both of these amounts will accordingly be allowed.

To summarize, then, the sums now awarded in case No. 5871 are as follows: For the wrongful death of Irvin N. Guyer $131,250.00, to be distributed to Mrs. Guyer and her three children as follows: Mrs. Guyer $92,100; oldest child $11,600; next child $13,100; youngest child $14,450. For personal injuries—physical and mental suffering of Mrs. Guyer—$30,000.00; and for her medical expenses $2715.59, and personal property loss $346.30.

We now turn in chronological order to the third suit, No. 5889, namely, that of Robert R. Bair, administrator of the Maryland Estate of Irvin N. Guyer, deceased, for himself as administrator, and also for the use of the Continental Insurance Company on account of insurance paid for damage to his automobile. This suit is properly divisible into two main parts, namely, (1) claim for pain and suffering of Guyer which resulted in his death, and (2) funeral expenses, personal property loss and damage to his automobile.

■■ Considering the first branch of the case, it is well settled in Maryland that an administrator is entitled to recover for pain and suffering of the deceased. Tri-State Poultry Cooperative, Inc., v. Carey, 190 Md. 116, 57 A.2d 812. There is no dispute over the fact that Guyer was pinned beneath the wreckage of the Snyder house and suffered excruciating pain and agony. However, mercifully for him, he did not remain conscious, according to the uncontradicted testimony, for more than thirty minutes when he died from asphyxiation and suffocation. The administrator of his estate is claiming the sum of $8,000.00. We feel that $5,000.00 is a more appropriate figure and the same is allowed.

■■ Turning to the second branch of the case, the administrator claims the total sum of $1946.23 as follows: funeral expenses $500.00. While the funeral bills were proved to have exceeded this amount, the administrator is limited by the Maryland statute to the recovery of $500.00. Article 93, Section 111, Maryland Code. Personal property loss, including clothes and personal effects, is claimed in the amount of $1140.60. There are a great many items that go to make up this account, all of which were secondhand, and the values given are largely unsupported by cost vouchers. Therefore, the Court feels that this item should properly be reduced by a sum not less than $500.00, and accordingly will allow a total of $640.60. There is one remaining item, damage to the automo-

bile of the deceased, which is conceded to have been in the amount of $305.63.

To summarize, therefore, the allowances in case No. 5889, they are as follows: for pain and suffering of the deceased, Irvin N. Guyer, $5,000.00; funeral expenses $500.00; personal property loss $640.60; automobile damage $305.63, a total of $6446.23.

We turn next to a consideration of cases Nos. 6096 and 6097, namely, the claims of Samuel R. Snyder, as administrator of the estates of his two deceased infant children. When killed, the younger of these children was only 8 weeks old, and the other 6½ years old. Uncontested claim for their funeral expenses in the total sum of $295.00, is made and this will be allowed. No claim is made by the administrator for any suffering on the part of the children because they are presumed to have been killed instantly. However, the administrator has made a claim for alleged pecuniary damage, based on the loss of benefits which the father, it is contended, would have derived from their probable earnings during their minority by way of assistance and support rendered him. The Government claims that under the Maryland statutes, Secs. 1, 2 and 3 of Article 67, and Sec. 111 of Article 93, of the Maryland Annotated Code 1951, as well as under the Federal Tort Claims Act, this Court has no jurisdiction to entertain a suit against the Government brought by an administrator for the wrongful death of deceased children. Government counsel contend that the case of Washington, B. & A. R. Co. v. State, 136 Md. 103, 111 A. 164, supports this position. But the later decision of the Supreme Court in Stewart v. Baltimore & Ohio R. R. Co., 168 U.S. 445, 18 S.Ct. 105, 42 L.Ed. 537, clearly authorizes a suit by the administrator.

In support of this theory of recovery, extensive figures were permitted to be introduced in evidence showing what female high school graduates in commercial courses now earn at given ages, namely, what they earn at starting salaries and subsequently under Civil Service, etc. However, this entire theory is highly speculative. In Agricultural & Mechanical Association v. State, 71 Md. 86, at pages 99–100, 18 A. 37, at page 37, the Court of Appeals of Maryland, in interpreting the rule of damages recoverable by a parent for the death of a minor child, said as follows: "The judge was clearly right in instructing the jury that in estimating the damages they were confined to the *pecuniary* damages sustained by the plaintiff. The authorities all agree that in suits under Lord Campbell's Act, and similar statutes in this country, pecuniary damages only can be recovered. Nothing can be given the father as a *solatium* for the bereavement suffered by the loss of his child. The statute does not deal with the priceless value at which a father holds the life of his child, and only professes to compensate him for the pecuniary loss he may sustain by his death." See also Baltimore Transit Co. v. State, for Use of Castranda, supra. As pointed out by counsel for the Government with respect to this claim, in the course of ordinary events it can hardly be said that the deceased children would have become wage earners before they became 16 years of age, which means that there would thereafter remain only 5 years before they reached their majority; and meanwhile, the cost to the parents before the children reached their majority, for their maintenance, education, etc., are expenses of which the parents have been relieved by the children's untimely deaths. But, in dealing with this question we are in the realm of speculation. The numerous pertinent decisions of the Court of Appeals are reviewed in Employers' Liability Assurance Corp. v. Baltimore & Ohio R. R. Co., 173 Md. 238, 195 A. 541.

The object of statutes creating a cause of action for death on account of the negligence of others has been to fill a serious gap in the common law, namely, to ameliorate the harsh rule that denied recovery if the injured person died, yet permitting recovery if he lived. Generally speaking, these statutes limit

the damages to the pecuniary loss sustained by the family of the deceased. Obviously, where the death of an infant is involved, since as yet no earning capacity has developed, the proper amount of damages is increasingly difficult to determine. However, this does not mean that substantial damages may not be awarded in the case of an infant or a minor of any age. In fact, the general rule is that substantial damages may be awarded in any death case in which the plaintiff prevails, irrespective of the age of the deceased. Mortality tables showing the life expectancy of the deceased as well as of the parents, are an aid in fixing proper damages to be awarded. In addition to the fact that the earnings of the child during his or her minority belong to the parent, the possibility that the child may contribute towards the parents' support not only during but even after the child reaches majority, may be taken into account. However, it would seem that as an offset, consideration may properly be given to the cost of rearing the child.

While numerous cases involving damage awards on account of death of children of varying ages have been decided by the Court of Appeals of Maryland, they have come usually before the appellate court on questions other than that of the amount of damages to be awarded. Furthermore, we find no decision of the the Court of Appeals which lays down any rule with respect to whether consideration must be given, in assessing the damages, to the cost of rearing the child. There have been, however, numerous cases in the lower courts, particularly in Baltimore City, where substantial awards have been made for the death of children of many different ages. A summary of a number of these cases was introduced in the course of the trial of the present case. Attention was called to the fact that in one of them, where an award of $3000.00 was made on account of the death of a boy, in 1938, who was less than 8 years old, an appeal was taken to the Court of Appeals, Bozman v. State, 177 Md. 151, 9 A.2d 60, and the judgment of the lower court was affirmed. However, the question of the amount of the award was not involved in the appeal. From this and similar cases, counsel for Mr. Snyder, as administrator of the estates of his two young children who were killed, argues that a recovery of not less than $5,000.00 or $6,000.00 should be allowed for the death of each child, asserting that such would be a comparable verdict at the present time on account of the greatly reduced value of the dollar today as compared to what it was in 1938 or even only 5 or 6 years ago.

In Hord v. National Homeopathic Hospital, 102 F.Supp. 792, a decision of the District Court for the District of Columbia, in a suit for death of a new born infant resulting from its fall into a hole in the delivery table at time of birth, an award of $17,000.00 against the Hospital was had and this was affirmed on appeal, D.C.Cir., 204 F.2d 397. The lower court's opinion is replete with discussion of the decisions bearing upon this subject, although again, the appeal did not discuss the underlying principles involved in determining the amount of the award.

The Government contends that the facts in the present cases do not warrant recovery of more than nominal damages. One of the children was six and a half years of age, the other only 2 months old when they met their tragic death. Counsel for the administrator contends, relying upon statistics as to potential earning power of girls, both before and after majority, with high school education, that the potential earning power of each of these children between the age of 17 and 21 would have been not less than $11,000; and in addition, it is claimed that some award should be made for their potential services to their parents between the ages of 10 and 17. But enough has been said to indicate that these latter figures are very definitely in the field of speculation. How much longer either child might have lived is the purest speculation. The same is equally true with respect to the character and extent of what, if any, pecu-

niary aid they might have rendered their parents; and what their parents might have spent for their support and education. In view of the aforegoing, while the Court believes that more than merely nominal damages should be awarded, it believes that the proper allowance lies somewhere between the two contentions of opposing counsel. Accordingly, we will allow in the case of each child the sum of $8000.00. To which must be added in each case the sum of $147.50, or one-half of the actual funeral expenses for both children, making a total allowance in each case of $8147.50.

We come next to suit No. 6098, that of Dorothea Snyder for: (1) destruction of her home and her personal property in which she had a joint interest with her husband, and therefore, whatever is allowed the wife with respect to both the home and personal property will be only one-half of the total damages; and (2) her own personal injuries.

As to the home, a good deal of testimony was heard with respect to its value. The Government's evidence was given by a local contractor and realtor, and also by the supervisor of tax assessments for Prince George's County. The value in 1951 of the house and land on which it was situated, according to the former witness, did not exceed, with improvements, $13,500.00, and according to the latter witness, $11,500.00. For the plaintiff, there was testimony that the house itself without the ground, was worth $13,000.00 or $14,000.00 in 1951. The husband valued the house at $11,500.00 The average of these four estimates is approximately $12,000.00. The land cost $900.00, and we have already allowed, in case No. 5615, the sum of $7,000.00 to the Travelers Fire Insurance Company for insurance paid on the dwelling. Deducting these two sums, a total of $7900.00, from the average of the four estimates of value, the remainder is $4100.00. An allowance of this sum appears to be fair and just compensation for . the destruction of the home, one-half to be allowed to each spouse. So, in the present case, to Mrs. Snyder will be awarded $2,050.00.

As to Mrs. Snyder's personal property loss, the total claim is for $8004.76. It covers many items of household furniture, clothing and personal effects, of varying age and usage. All receipts were destroyed with the house. Therefore, such evidence as was available to the Court was oral, i. e., what Sergeant Snyder and his wife claimed to have paid for the various articles, how long they had owned them, etc. The court is not disposed to say that there was intentional padding of this claim. Nevertheless, it is doubtful, because of the extent of speculation necessarily involved, whether full regard has been given to the obsolescence or worn condition of many of the items at the time of their destruction. Accordingly, the amount claimed will be reduced by $1500.00, and a total claim allowed for $6504.76, one-half to be awarded to the wife in the instant case, or $3252.38.

There remains to be considered in case No. 6098 the amount of damages to which Mrs. Snyder is entitled on account of her own personal injuries. These were of a substantial character. She was hospitalized for 23 days, having received facial wounds, various contusions and first degree burns of the face, arms and legs. Also, her nose was fractured, and she received multiple, deep lacerations of the right knee, resulting in a permanent scar.

No testimony was presented of a private physician, but there was a good deal of testimony given by the Government physicians who had examined her, and who impressed the Court with their desire accurately to state the character and extent of Mrs. Snyder's injuries. Summarized, their testimony, in addition to the aforegoing injuries, indicated that Mrs. Snyder has, as a result of them, some permanent impairment of her hearing,—about 16% in the left ear and about 8% in the right. From their testimony, it also appears that her present physical disability, apart from her hearing, is about 10% and probably of a

permanent character. As to her mental condition, it appears that she has made as good an adjustment as should be expected under the tragic circumstances.

 Mrs. Snyder's life expectancy is 37.75 years. For her physical and mental injuries, her counsel claim that she should be allowed a total of $16,-850.00, itemized as follows: For her undisputed injuries, namely, contusions, burns, fracture of the nose, etc., $8350.-00; for impairment of hearing $1500.00; and in addition, on account of estimated impairment of her general physical and mental condition, $7000.00. The Government maintains that Mrs. Snyder should be allowed much less, claiming she has not been greatly injured, although admitting that she has suffered, and continues to suffer mentally and nervously because of the tragic death of her children and complete destruction of her home. The Government has argued that the allowance to Mrs. Snyder should not exceed $3500.00. With this we cannot agree, because we believe that the credible evidence indicates that both her physical and mental injuries and suffering are of a substantial character, and to the extent already stated, will, in all likelihood, remain permanent. For these reasons, we will allow the sum of $14,-850.00; that is to say, the total amount claimed by Mrs. Snyder's counsel, less $2,000.00, because the $7,000.00 claim for physical and mental impairment over and above the actual tangible injuries we feel should be reduced to $5000.00.

To summarize, Mrs. Snyder is awarded the following: for loss of her home, one-half of the joint allowance of $4100.-00 to her husband and herself, or $2050.-00; for loss of personal property, one-half of the total allowance of $6504.76, $3252.38; for personal injuries, physical and mental, $14,850.00, or a total of $20,-152.38.

We come to the last of the seven cases, namely, case No. 6099, which involves the claims of Samuel R. Snyder, on account of his own personal injuries.

The Government claims that since Sergeant Snyder is entitled under Congres-sional Act to a pension for any disability resulting from the airplane accident, and has lost no earnings because he has been in continuous employment in the Air Force ever since the accident, at full pay, there is nothing to which he is entitled under the Federal Tort Claims Act. The Government further contends that recovery should be denied for the additional reason that his injuries occurred incident to his military service. But we find that neither of these contentions is correct. They raise questions both of law and of fact. Therefore, in order to make it clear why we reach the conclusion that we do, it is necessary to understand (1) the exact military status of Sergeant Snyder at the time he was injured; and (2) whether the Federal Torts Claims Act permits recovery for injury caused by negligence of the Government to one in his status.

First, then, as to the precise military status of Sergeant Snyder at the time of the accident on April 8, 1951. According to the records in Headquarters Squadron, Section Civil Air Patrol, U. S. Air Force, Bowling Air Force Base, Washington 25, D.C., Sergeant Snyder "(a) * * * was on normal off duty hours on 8 April 1951, and was authorized to be off base on an Armed Force Liberty Pass, DD Form 345, number 61, issued by this Headquarters under the provisions of Air Force Regulations in effect at the time. (b) He Snyder was not required for duty until 0800 Monday morning 9 April 1951." It is admitted by the Government that the time limits section of DD Form 345, contains the following: "There are no time or range travel limitations on this pass except that the bearer must be present for duty at the appointed time and station as directed and required." The Government further admits that pursuant to the authority of the Armed Forces Liberty Pass which Sergeant Snyder held on April 8, 1951, he left his duty station at Bowling Air Force Base in the District of Columbia and went to his privately owned home in Morningside, Maryland, where he was injured when an airplane crashed into his home after taking off

from Andrews Air Force Base and being thereafter abandoned in mid-air.

 From these admitted facts it is clear that Sergeant Snyder's injuries were not service-connected, or in any sense incident to his military service. Government counsel, however, contend that the Liberty Pass issued to Snyder was entirely different from the granting of leave or furlough; that by virtue of the Air Force Regulations in effect at the time, Snyder was merely authorized to be absent from his station, and that his official status was "on duty" on April 8, 1951. But this is directly contrary to the official, Headquarters record of his status, just quoted, as is also the perfunctory phraseology of an entry in the day report, which used the words "Permanently assigned, Present for duty". This case is clearly governed by the decisions of the Supreme Court in Brooks v. United States, 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200, and Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152, which make no such refinements as Government counsel would have us do, but these decisions are rested upon *actual fact.* Here the actual fact is that what Snyder was doing at the time he was injured had absolutely nothing to do with his military service, and it was so understood by his superiors, except, as the Court said in the Brooks case, 337 U.S. at page 52, 69 S.Ct. at page 920, "in the sense that all human events depend upon what has already transpired." In the Brooks case the facts were these: two brothers, Welker Brooks and Arthur Brooks, with their father, James Brooks, were riding in their automobile along a public highway in North Carolina, on a dark, rainy night. Arthur was driving. He came to a full stop before entering an intersection and proceeded across the nearer lane of the intersecting road. Seconds later the car was struck on the left side by a United States Army truck driven by a civil employee of the Army. Arthur was killed and both his father and brother badly injured. At the time of the accident the brothers were enlisted men in the United States Army on leave or furlough, engaged in their private concerns and not in any business connected with their military service. The Government moved to dismiss the suit on the ground that the fact that the brothers were in the Armed Forces at the time of the accident barred recovery. The District Court for the Western District of North Carolina entered judgment against the Government but the Court of Appeals for the Fourth Circuit reversed, Judge Parker dissenting. 169 F.2d 840. The Supreme Court granted certiorari, 335 U.S. 901, 69 S.Ct. 405, 406, 93 L.Ed. 436, and reversed the case and remanded it to the Court of Appeals for its consideration of the problem of reducing damages pro tanto.

The Supreme Court, in the course of its opinion said, 337 U.S. 49, at pages 51–53, 69 S.Ct. at page 919: "The statute's terms are clear. They provide for District Court jurisdiction over *any* claim founded on negligence brought against the United States. We are not persuaded that 'any claim' means 'any claim but that of servicemen.' The statute does contain twelve exceptions. § 421 (now 28 U.S.C.A. § 2680). None exclude petitioners' claims. * * * Wihout resorting to an automatic maxim of construction, such exceptions make it clear to us that Congress knew what it was about when it used the term 'any claim.' It would be absurd to believe that Congress did not have the servicemen in mind in 1946, when this statute was passed. The overseas and combatant activities exceptions make this plain.

"More than the language and framework of the act support this view. There were eighteen tort claims bills introduced in Congress between 1925 and 1935. All but two contained exceptions denying recovery to members of the armed forces. When the present Tort Claims Act was first introduced, the exception concerning servicemen had been dropped. What remained from previous bills was an exclusion of all claims for which compensation was provided by the World War Veterans' Act of 1924, 43

Stat. 607, 38 U.S.C. § 421 et seq., 38 U.S.C.A. § 421 et seq., compensation for injury or death occurring in the first World War. H.R. 181, 79th Cong., 1st Sess. When H.R. 181 was incorporated into the Legislative Reorganization Act, the last vestige of the exclusion for members of the armed forces disappeared. See also Note, 1 Syracuse L.Rev. 87, 93–94.

"The Government envisages dire consequences should we reverse the judgment. A battle commander's poor judgment, an army surgeon's slip of hand, a defective jeep which causes injury, all would ground tort actions aainst the United States. But we are dealing with an accident which had nothing to do with the Brooks' army careers, injuries not caused by their service except in the sense that all human events depend upon what has already transpired. Were the accident incident to the Brooks' service, a wholly different case would be presented.

\* \* \* \* \* \*

"*Provisions in other statutes for disability payments to servicemen, and gratuity payments to their survivors, 38 U.S.C. § 701, 38 U.S.C.A. § 701, indicate no purpose to forbid tort actions under the Tort Claims Act.* Unlike the usual workman's compensation statute, e. g., 33 U.S.C. § 905, 33 U.S.C.A. § 905, there is nothing in the Tort Claims Act or the veterans' laws which provides for exclusiveness of remedy. United States v. Standard Oil Co., 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067, indicates that, so far as third party liability is concerned. Nor did Congress provide for an election of remedies, as in the Federal Employees' Compensation Act, 5 U.S.C. § 757, 5 U.S.C.A. § 757. Thus, Dahn v. Davis, 258 U.S. 421, 42 S.Ct. 320, 66 L.Ed. 696, and cases following that decision, are not in point. Compare Parr v. United States, 10 Cir., 172 F.2d 462. We will not call either remedy in the present case exclusive, nor pronounce a doctrine of election of remedies, when Congress has not done so. Compare 31 U.S.C. § 224b, 31 U.S.C.A. § 224b, specifically repealed by the Tort Claims Act, § 424(a). In the very Act we are construing, Congress provided for exclusiveness of the remedy in three instances, §§ 403(d), 410(b), and 423 (now 28 U.S.C.A. §§ 1346, 2672, 2679), and omitted any provision which would govern this case.

"But this does not mean that the amount payable under servicemen's benefit laws should not be deducted, or taken into consideration, when the serviceman obtains judgment under the Tort Claims Act." (Emphasis supplied.)

Turning to the Feres case, it embraces three separate suits in one opinion, the facts in which were as follows, as stated in the opinion, 340 U.S. 136–137, 71 S.Ct. 153, 155: "The Feres case: The District Court dismissed an action by the executrix of Feres against the United States to recover for death caused by negligence. Decedent perished by fire in the barracks at Pine Camp, New York, while on active duty in service of the United States. Negligence was alleged in quartering him in barracks known or which should have been known to be unsafe because of a defective heating plant, and in failing to maintain an adequate fire watch. The Court of Appeals, Second Circuit, affirmed. 177 F.2d 535.

"The Jefferson case: Plaintiff, while in the Army, was required to undergo an abdominal operation. About eight months later, in the course of another operation after plaintiff was discharged, a towel 30 inches long by 18 inches wide, marked 'Medical Department U. S. Army,' was discovered and removed from his stomach. The complaint alleged that it was negligently left there by the army surgeon. The District Court, being doubtful of the law, refused without prejudice the Government's pretrial motion to dismiss the complaint. 74 F.Supp. 209. After trial, finding negligence as a fact, Judge Chesnut carefully reexamined the issue of law and concluded that the Act does not charge the United States with liability in this type of case. D.C., 77 F.Supp. 706. The Court of Appeals, Fourth Circuit, affirmed. 178 F.2d 518.

"The Griggs case: The District Court dismissed the complaint of Griggs' executrix, which alleged that while on active duty he met death because of negligent and unskillful medical treatment by army surgeons. The Court of Appeals, Tenth Circuit, reversed and, one judge dissenting, held that the complaint stated a cause of action under the Act. 178 F.2d 1."

The Supreme Court affirmed the decision of the Court of Appeals, Second Circuit, in the Feres case and also that of the Court of Appeals, Fourth Circuit, in the Jefferson case, but reversed the Tenth Circuit Court of Appeals in the Griggs case.

In its opinion covering all three cases, the Court said, 340 U.S. 135, at pages 138, 144, 146, 71 S.Ct. at page 155: "The common fact underlying the three cases is that each claimant, *while on active duty and not on furlough, sustained injury* due to negligence of others in the armed forces. The only issue of law raised is whether the Tort Claims Act extends its remedy to one sustaining 'incident to the service' what under other circumstances would be an actionable wrong. This is the 'wholly different case' reserved from our decision in Brooks v. United States, 337 U.S. 49, 52, 69 S.Ct. 918, 920, 93 L.Ed. 1200.

\* \* \* \* \* \*

"This Court, in deciding claims for wrongs incident to service under the Tort Claims Act, cannot escape attributing some bearing upon it to enactments by Congress which provide systems of simple, certain, and uniform compensation for injuries or death of those in armed services. We might say that the claimant may (a) enjoy both types of recovery, or (b) elect which to pursue, thereby waiving the other, or (c) pursue both, crediting the larger liability with the proceeds of the smaller, or (d) that the compensation and pension remedy excludes the tort remedy. There is as much statutory authority for one as for another of these conclusions. If Congress had contemplated that this Tort Act would be held to apply in cases of this kind, it is difficult to see why it should have omitted any provision to adjust these two types of remedy to each other. The absence of any such adjustment is persuasive that there was no awareness that the Act might be interpreted to permit recovery for injuries incident to military service.

\* \* \* \* \* \*

"The actual holding in the Brooks case can support liability here only by ignoring the vital distinction there stated. *The injury to Brooks did not arise out of or in the course of military duty.* Brooks was on furlough, driving along the highway, under compulsion of no orders or duty and on no military mission. A Government owned and operated vehicle collided with him. Brooks' father, riding in the same car, recovered for his injuries and the Government did not further contest the judgment but contended that there could be no liability to the sons, *solely because they were in the Army.* This Court rejected the contention, primarily because Brooks' relationship while on leave was not analogous to that of a soldier injured while performing duties under orders.

"We conclude that the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of *activity incident to service.* Without exception, the relationship of military personnel to the Government has been governed exclusively by federal law. We do not think that Congress, in drafting this Act, created a new cause of action dependent on local law for service-connected injuries or death due to negligence. We cannot impute to Congress such a radical departure from established law in the absence of express congressional command." (Emphasis supplied.)

Since, therefore, we find that Master Sergeant Snyder may sue under the Tort Claims Act, we turn to an analysis of his claim for personal injuries and for the destruction of his home and personal property. He makes no claim for hospital and medical expenses, since

these were provided by the Government at no cost to him. Also, he makes no claim for loss of earnings from April 8, 1951, up to the present time, since he has been drawing Air Force pay during the entire period.

First, as to Snyder's personal injuries, the credible medical testimony shows that he suffered multiple lacerations of the face and neck, and that his right shoulder and left leg were burned, leaving permanent scars. The credible medical testimony also shows that Snyder is psychoneurotic as a result of the airplane crash, and he is said to have a 30% mental disability. The Government physicians make only a guarded prognosis of improvement. They also admit that disfiguring scars on the Sergeant's face constitute a 10% disability under Federal compensation ratings. He spent 23 days in the hospital following the accident. He testified that he still has considerable trouble with his legs; that his sight is still impaired, and that he suffers from headaches. However, since the accident, that is, in March 1953, he was accepted for re-enlistment which, prima facie, would indicate that he is not in very bad physical or mental condition. Because he is now regularly in the Service, and because of what he may receive by way of disability allowances, the Government claims that he should not be awarded more than $5000.00 for his injuries. As opposed to this, the Sergeant's counsel contend for an award as follows: for injuries to face and jaw, $5875.00; on account of other lacerations, $2500.00; for mental impairment, $4560.00, this latter being claimed to be the same to which he would be entitled through the Veterans Administration were he discharged in such condition from military service; and finally, a further sum as additional compensation on account of the likelihood of permanent disability. In this latter connection, figures were presented to the effect that Snyder, in his present condition, were he out of the military service, would be entitled to receive by way of Veterans'

compensation $756.00. This, multiplied by his life expectancy of 37 years, gives $27,972.00. It is contended that he is now entitled to at least one-half of this, or $13,986.00.

To summarize, Snyder is claiming for his personal injuries a total of $26,921.00.

Counsel for both Snyder and the Government have stipulated that he can be retired by the Air Force for the injuries suffered in the accident of April 8, 1951, provided it is determined by the appropriate authorities that (1) at the time of his injuries, he was entitled to receive base pay; (2) at the time an order of retirement is made, he is, likewise, entitled to receive base pay; (3) his injuries have resulted in at least a 30% disability; (4) they were incurred in line of duty, and (5) they make him unfit for the performance of the duties of his grade. If all of these conditions are met, Snyder would be dischargeable from the Service, with severance pay. Having had 14 years service, he would thereupon be entitled to such pay equalling his base pay, namely $252.25 per month, multiplied by 24 months service, or $6054.00.

It is further stipulated that if Snyder should be permanently retired with 40% disability after 14 years service, he would be entitled to 40% of his base pay, or $100.90 a month,—$1210.80 per year. If his disability rating were 30% but less than 40%, he would be entitled to an election as to whether he would take 30% or 35% of his base pay. Should he be retired temporarily and not permanently with the percentage of disability and his length of service the same as just given, Snyder would be entitled to 50% of his base pay, or $126.13 per month,—$1513.56 per year.

The stipulation is further to the effect that Snyder could not remain on the temporary retired list longer than five years more, during which time he must be re-examined. If found fit for duty, he will be returned to duty, but if found unfit, with a permanent disability of 30% or more, he will then

be retired on a permanent basis. However, if found to have a less permanent disability, he will be discharged with severance pay which, if we assume the discharge would be after 14 years service, would equal base pay times 24 months service, or $6054.00. Also, it is stipulated that in order to receive disability compensation from the Veterans Administration, Snyder need not be found unfit for military duty by the Air Force. However, insofar as psychiatric disability is concerned, he must be found to have a compensable degree of social and industrial impairment after Veterans Administration examination, in order to receive compensation from the latter. Should his condition be rated by the Veterans Administration at 30% psychiatric disability and 10% physical disability on account of his scars, he would be entitled to a total 40% disability rating, under which he could receive disability compensation at the rate of $63.00 a month, or $756.00 per year, in accordance with present Federal legislation. Such an award would be subject to readjustment either by way of increase or decrease, depending upon changes in Snyder's physical condition, verified by Veterans Administration examination.

Finally, it was stipulated that the foregoing disability compensation cannot be paid concurrently with Air Force retirement pay. However, if a Veteran has been retired by the Air Force for disability and is receiving retirement pay therefor, he may file a claim with the Veterans Administration for Veterterans compensation. Should his claim be honored, he may then make an election between receiving Air Force disability retirement pay or Veterans compensation.

█ On the aforegoing state of facts, this Court concludes that Sergeant Snyder's condition, both present and prospective, as a result of his injuries due to the accident of April 8, 1951, does not entitle him in this proceeding to a total amount in excess of $15,000.00.

As will appear from the above stipulation of facts, with respect to possibility of such prospective compensation, there is a real likelihood of his receiving $756.-00 a year on the basis of presently applicable Congressional legislation. This, multiplied by his life expectancy of 37 years, gives the sum of $27,972.00. It is the likelihood of receiving at least a considerable portion of this substantial sum, depending, of course, upon how long he lives as well as uncertainties as to his disability rating, etc., that has influenced this Court in fixing the present award to him for his personal injuries at $15,000.00. Such prospective further remuneration by way of Veterans compensation must be taken into account in accordance with the ruling of the Supreme Court in the Brooks case, supra.

In addition to the aforegoing, Snyder is also entitled to $2050.00 on account of his one-half share in the net damages allowed to him and his wife jointly for destruction of his home, and $3252.38 for loss of personal property jointly owned with his wife, namely, one-half of $6504.76.

To summarize, the allowance to Snyder will, accordingly, be: for personal injuries, $15,000; for loss of home, $2050.-00, and for loss of personal property, $3252.37,—total $20,302.38.

A recapitulation of the total sum allowed in each of the seven cases is as follows:

| Case number | Total damages |
|---|---|
| 5615 | $ 7,000.00 |
| 5871 | 164,311.89 |
| 5889 | 6,446.23 |
| 6096 }<br>6097 } | 16,295.00 |
| 6098 | 20,152.38 |
| 6099 | 20,302.38 |
| Total | $234,507.87 |

The amounts to be allowed as fees to plaintiffs' attorneys will be separately considered and determined.