SCOTT, ADMINISTRATRIX, ET AL. *v.* JAMES GIBBONS CO.

[No. 82, October Term, 1948.]

*Decided February 11, 1949.*

The cause was argued before MARBURY, C. J., DELA-
PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Paul Berman* and *Sigmund Levin*, with whom were
*William Carswell Baxter* and *Theodore B. Berman* on the
brief, for the appellants.

*James J. Lindsay, Jr.*, and *Phillip S. Ball*, with whom
was *G. Dudley Iverson* on the brief, for the appellee.

GRASON, J., delivered the opinion of the Court.

The accident out of which these cases arose occurred
on a bridge which spans the Patapsco River on the Wash-
ington Boulevard, which runs from Baltimore, Md. to
Washington, D. C. and is known as U. S. Route 1. Frank
M. Scott was killed in that accident and his widow,
Christine Scott, brought two suits for damages against
the James Gibbons Company, a body corporate, one
under Lord Campbell's Act and one as administratrix
of the estate of Frank M. Scott, deceased. The cases
were consolidated and tried together. The trial court
directed a verdict for the defendant in each case, upon
which judgments were entered and from which plaintiff
appeals.

The defendant is engaged in building and repairing
roads, and owns a large amount of machinery, which is
stored in a yard near Relay, Baltimore County. This yard
is reached by a narrow road running westerly from Route
1 for a distance of about a quarter of a mile, and it is
about three-quarters of a mile from Elkridge. Machinery
is dispatched from this yard, by the superintendent of
the yard, to operations in which the company is engaged.

This accident happened on June 15, 1946, at about
11:30 p. m. The road was dry, the weather clear, and
no one saw the accident. At that time the defendant was
engaged in repairing a road that runs from Fredericks-
burg, Virginia, southerly through several counties of that
state. This work was being done for the Virginia State
Highways Department. Carlton J. Layne was employed

by the defendant to superintend this project. He stayed at a boarding house in Warsaw, Virginia, and as he had no office the company communicated with him at his boarding house, by telephone. He was directed by Mr. Charles D. Jones, the vice president and general manager of the defendant, to bring a piece of machinery which was then at Warsaw to the company's yard near Relay, Maryland. This trip was to be made on Saturday afternoon, and the tractor-trailer used in hauling the machinery, after the mission was accomplished, was to be immediately returned to Warsaw to be used on the Virginia project Monday morning. The distance from Warsaw to the company's yard is about one hundred and twenty-five miles, making the round trip two hundred and fifty miles. Layne left Warsaw in company with a man named Charles Martin. Martin drove the tractor. He was hired by Layne to work on the Virginia road. They left Warsaw around noon on June 15, 1946. Layne's purpose was to deliver the machinery and immediately return to Warsaw.

The evidence in the case shows that on the way to the defendant's yard the tractor became impaired and they did not arrive at the yard until after 10 o'clock that night. The condition of the tractor was such that it could not be used with safety to make the return trip to Warsaw without repair.

Randolph Walrath was employed by the defendant. His duties were to see that the equipment was kept in repair and assigned to jobs. Layne called Walrath and told him that the lights were short-circuited and the generator on the tractor was not working and asked him to fix it. Walrath told him that he would do it the next day, Sunday. Layne said: "Where am I going to stay?" and Walrath suggested that he go to a boarding house in Elkridge. Layne asked permission to use a tractor to drive to Elkridge. Walrath told him he could not do this as it was against the company's rulings, and suggested that he ask Frank Breedon, who lived nearby,

to take him to Elkridge. This testimony as to what Walrath said was admitted in evidence over objection.

Layne took a tractor known as No. 55, and with Martin driving started for Elkridge. On the way to Elkridge the accident that caused his death, and the death of Scott, happened.

The trial court was of the opinion that there was no evidence legally sufficient to show that at the time and place of the happening of the accident involved here Layne was the agent of the defendant, and hence directed a verdict for the defendant in each of these cases.

The appellee contends that Layne was without authority, express or implied, to use tractor No. 55 to go from the yard to Elkridge for the purpose of obtaining lodging for the night, that his duty to the defendant for the day was finished when he arrived at the yard, and hence he was not engaged in the defendant's business when he left the yard in tractor No. 55 to go to Elkridge. The evidence shows that Layne was paid a monthly salary and was on call at any time by the company in matters pertaining to the project in Virginia. He was directed to return a piece of machinery to the company's yard. He was not expected to drive. He had authority to direct any one in his employ on the Virginia job to drive, and he selected Martin.

It is the established law of this state that there is a presumption that the driver of an automobile is the agent and servant of the owner. This presumption is rebuttable, but the evidence necessary to destroy the presumption as a matter of law must be uncontradicted and conclusive, and if the evidence in the case, as to agency, is contradicted, or if uncontradicted is not conclusive, it becomes a question of fact and must be submitted to the jury. *National Trucking & Storage, Inc. v. Durkin*, 183 Md. 584, at page 588, 39 A. 2d 687; *Taylor v. Freeman*, 186 Md. 474, at page 477, 47 A. 2d 500.

As to agency, the question is: was the use of tractor No. 55 by Layne and Martin in going from defendant's yard to Elkridge for the purpose of finding a place to

sleep within the scope of the business of the defendant upon which they were then engaged, or incident thereto? If it was, then the question becomes immaterial and the lower court was in error in taking these cases from the jury on the ground of non-agency.

Layne was directed to deliver a piece of machinery to defendant's yard. He was given no specific instructions in the matter. His authority to use all reasonable means to accomplish his master's purpose was unquestioned. There is no doubt that if the tractor he used to bring the machinery to the yard had not become impaired and he had used it in going to Elkridge to a hotel to sleep, he would have had perfect authority to do so. These men had driven one hundred and twenty-five miles in a tractor, hauling a loaded trailer, that became disabled along the way, and were tired and sleepy as it was then about 10:30 p. m. Mr. Jones, the vice president and general manager of defendant, directed Layne to return to the yard a piece of machinery then at Warsaw, Virginia. This had been accomplished, but the return trip to Warsaw had to be made. Jones expected the trip to the yard and back again to Warsaw to be made in one day. Jones testified if both of these men were sleepy he would not have expected them to return that night, and the defendant would have paid the expenses for lodging of Martin, but not Layne, as he had an expense account.

This court has frequently held that the master is liable for the tortious act of his agent resulting in injury and damage to a third party, if at the time and place the tortious act was committed the agent was within the scope of the master's business. *Great Atlantic & Pacific Tea Co. v. Noppenberger,* 171 Md. 378, 189 A. 434; *Regal Laundry Co. v. A. S. Abell Co.,* 163 Md. 525, 163 A. 845; *Heaps v. Cobb,* 185 Md. 372, 45 A. 2d 73; *East Coast Freight Lines v. Mayor & City Council, etc.,* 190 Md. 256, 58 A. 2d 290, 2 A. L. R. 2d 386.

We could cite a number of our decisions on this point, some of which are referred to and quoted in the above cited cases.

In *Adams v. South Carolina Power Co.*, 200 S. C. 438, 21 S. E. 2d 17, 20, Blease, an engineer in the employ of the company, was required to make investigatory trips in an automobile furnished by his employer. When away he stopped at various convenient places to sleep. At the time of the collision, at 1 a. m., Blease was driving towards the town of Walterboro, solely for the purpose of sleeping there, his duties on the following day requiring his presence in a nearby town called Ruffin. It was held: "At the time of the automobile collision, it may reasonably be inferred from his testimony that he was traveling to Walterboro on the business of his employer."

In *Brown v. Montgomery Ward & Co.*, 104 Cal. App. 679, 286 P. 474, 475, Vinje was a traveling auditor for the company. He was supposed to report at the main office at Oakland. He passed that store, as it was closed, continued on his way to his home, when the accident happened. The court said: "After Mr. Vinje arrived at the Oakland store and found it closed, under the terms of his contract of employment, he was entitled to go to his home. Whether his program ended on arriving at his home or ended when, on Monday morning, he arrived at the office need not be determined. It had not ended when the accident occurred."

In *Radoccia v. Goodrich Oil Co.*, 63 R. I. 58, 6 A. 2d 746, 750, it was said: "Under exceptional circumstances, when something in the general nature of an emergency exists, an employee, who is for the time being in charge for the employer of some part of the employer's business and who ordinarily would have no authority to drive in that business a car of the employer or to authorize a subordinate employee to use in that business a car belonging to himself, may have implied authority, in dealing with the unusual, and unforeseen situation, to do either of these things."

When Layne and Martin arrived in defendant's yard on the night of the accident they had not completed their master's business. It would have been finished when they returned to Warsaw. Mr. Jones, the vice president and general manager of the defendant, testified that these men were authorized to get a place to sleep that night, and that he would expect them to do so and would not have wanted them to drive a tractor when they were sleepy. He said that the expenses incident thereto would have been paid by the company. We hold that at the time and place of the happening of the accident here dealt with Layne and Martin were engaged on a matter incident to the company's business and within the scope of their employment.

In *National Trucking & Storage, Inc. v. Durkin, supra* [183 Md. 584, 39 A. 2d 689], we said: "If the facts show a departure from the master's business, the chain of liability is served, but if the facts show a mere deviation in the servant's interest, liability still may attach, and the question is one for the jury."

That case and the case of *Taylor v. Freeman, supra,* are illustrative of cases where the facts prove "the chain of liability is severed," but the principles announced in those cases apply to the case at bar.

We do not think that the cases cited on appellee's brief are applicable to the facts of this case. We cannot adopt the theory that the duties of these men ended that day when they arrived at the yard, but on the contrary hold that at the time and place of the accident in question these men were engaged in a matter incident to their employment by the defendant. The court, therefore, erred in withdrawing these cases from the jury.

Trooper Davis, a member of the Maryland State Police, was the first person to arrive at the scene of the accident. He is stationed at Waterloo Barracks, a short distance from the Patapsco River bridge. He was patrolling U. S. Route 1 in an automobile equipped with a two-way radio, and was traveling in a southerly direction. At about 11:45 p. m. he passed over the bridge, turned his

car around and parked. He saw a wrecked 1946 Chevrolet coupe, the left side of which was caved in so that the door could not be opened. A man was sitting under the steering-wheel. He then noticed that a man was under the right rear wheel of a tractor. His legs were pinned under the tractor. He saw no one in the tractor. He returned to his car, called his headquarters and asked that equipment be sent to extract the man from the coupe and to release the man pinned under the rear wheel of the tractor. Each of these vehicles had mounted the pedestrian walk on the east side of the bridge, and was rammed against the abutment. The tractor was about thirty feet south of the coupe. While waiting for the equipment to arrive he set out flares along the road, to guide traffic. In about ten minutes the machinery used in extricating these men, together with two ambulances, and five or six state policemen arrived. These men were released and sent to a hospital. The trooper thought that this was accomplished in about twenty minutes after he arrived at the scene of the accident. Shortly after he arrived at the bridge he saw a man walking about with a wound in his head, apparently dazed. The man said he was the driver of the tractor and he was placed in the ambulance with Layne and sent to a hospital.

The trooper stated that the Washington Boulevard is forty feet wide, from curb to curb. It is divided into four lanes. The center is marked by a double white line and each side of this white line is further divided into two lanes separated by a yellow line. At the time of the accident the State Roads Commission had posted a sign reading: "Keep to right, pass on left, do not cross white line". He testified: "When I arrived there, I was going south and I was just entering this sharp curve that comes on to the bridge". After the injured had been dispatched to a hospital, he then examined the road, which was a black top macadam road. It was his duty to "clean up the accident" as soon as possible, and he had a crane remove the tractor and the coupe so as to free the bridge for traffic. He found skid marks on the

road, and glass and dirt. He was asked by the court: "How could you tell what machine made the marks?" A. "Your Honor, just approximately from the skid marks, they weren't a skid mark made by a car coming to a stop, they were made broadside, and they led right up to this car—* * * After the point of impact, I walked, pacing myself, approximately ten paces back and 1 found some more debris located on the crosswalk, pedestrians walk across the bridge, where there was some more glass and debris. Then I found more skid marks and they were right heavy appearing and they were quite wide, two sets of heavy skid marks that led directly up to the rear of the tractor, which was wedged with its left front side against the cement railing of the bridge, the east side. They were made by the tractor. * * * They were all wide skid marks, the tractor had dual heavy wheels in the rear of the tractor and had just single heavy wheels in the front, and they were dual skid marks, because they were so wide. They were approximately that wide and skidded right on up to the back of this tractor." He then took several photographs of the vehicles involved in the accident, which we need not refer to.

It appears that the coupe operated by Mr. Scott was proceeding north on the right side of the road, in the slow lane. It was jammed against the abutment, in a wrecked condition. The tractor No. 55 belonging to the defendant was found about thirty feet south of the coupe, jammed against the abutment of the bridge, on the east side. The evidence shows that when this tractor left the yard it was driven by Martin, accompanied by Layne, and was on its way to Elkridge, which is south of the bridge. There is evidence tending to show that the tractor crossed the center white line, traveled over the northbound fast lane, hit the coupe which Mr. Scott was driving in the slow lane, and skidded from that point to where it came to rest on the pedestrian walk, against the abutment on the east side of the bridge. The skid marks from the coupe to where the tractor came to rest

are wide skids and show that they were made by dual tires on the rear wheels of the tractor. This evidence tends to show that the tractor, at the time of the accident, was negligently operated, in that it was traveling on the the left side of the bridge and that this was the direct and proximate cause of the accident and called for the submission of the case to the jury. *Acme Poultry Corp. v. Melville,* 188 Md. 365, 53 A. 2d 1.

The facts in this case are very different from the facts in the case of *Shafer v. State,* 171 Md. 506, 189 A. 273. In that case the operator of the truck involved in the accident was not killed, and he testified that he was driving to the right of the center of the road, but that the automobile, when it was in close proximity to the truck suddenly turned to its left. Furthermore, the skid marks relied on in that case were indistinct and were characterized by this court as sufficient only to give rise to a speculation that the defendant was negligent. This is not the case here.

Certain hospital records were offered in evidence and objections made thereto because they contained evidence that was clearly hearsay and had nothing to do with the history of the patient's case or his physical condition. Of course such records are admissible, and statements therein showing the history of the patient's physical condition are proper. History in this connection means the physical background as well as the present condition of the patient. It is proper for the record to show the patient was hurt in an automobile accident, but the particulars of such accident, contained in a hospital record, should be deleted and not submitted to a jury in a case like this. This is hearsay. *Bethlehem-Sparrows Point Shipyard v. Scherpenisse,* 187 Md. 375, 50 A. 2d 256; *Snyder v. Cearfoss,* 190 Md. 151, 57 A. 2d 786.

Objection was made to the testimony of the witness Kenigson. He is an associate actuary and secretary of the Sun Life Insurance Co. of America, and stated that he was familiar with life actuarial tables and annuity tables and that the table now used is the '37 Standard

Unit Table. He was asked the following question: "Can you give us, based on the accepted mortality tables, the joint life expectancy of a white male, born January 6, 1890, and a white female, born June 25, 1896, as of June 17, 1946, that's the date of Mr. Scott's death?" (Scott was born January 6, 1890 and Mrs. Scott was born June 25, 1896.) He stated that the table he used "is based on the United States Life Tables of 1939-1941, in other words, based on the census statistics which were compiled for 1940." He then answered the question: "The joint expectancy is 14.76 years." He was then asked if he was familiar with the cost of annuities and he said he was. Based on the respective births of Mr. and Mrs. Scott, he was asked the cost of an annuity to produce $112.90 monthly. This sum was a pension Scott was drawing at the time of his death. To this question an objection was sustained. The appellants offered to prove that such an annuity would cost $20,-686.19, and that an annuity to provide $44 weekly (the wages Scott was drawing at the time of his death) would be $34,910.91, making the cost of both annuities $55,-597.10. This was objected to and an offer to prove the same made, and the offer overruled.

It is the practice, to establish damages in a case like this, to prove joint life expectancy by an actuary who uses established mortality tables, and annuity tables, showing a sum of money that would produce an income equal to the loss occasioned by death. This method of proof is permitted because of the difficulty of establishing damages in any other way. Professor Wigmore, in his work on *Evidence*, Vol. VI, section 1698, says: "In fact, some of these particular tables have been among the least trustworthy of scientific efforts. The first mortality table appeared about 1690, and was crude in comparison with those of today. The errors in tables even of the 1800s were numerous and radical. The simple fact is that the admission of a certain class of statistics was demanded by custom and practical convenience, and the judicial mind relented."

In Jones, *Commentaries on Evidence,* Vol. 3, page 740, this kind of evidence is treated as an exception to the hearsay rule. "The reasons on which testimony of this character is excluded have far less weight where the inquiry relates to the *exact sciences:* and in numerous instances the rule has been relaxed in such cases. To this class belong tables of logarithms, of astronomical calculalations, of weights and measures and of interest. The rule is the same as to annuity tables; the Carlisle and Northampton tables properly authenticated, are often received as evidence of the probable duration of human life."

We think, however, there was no error in sustaining the objection because the answer did not call for a computation from annuity tables, admitted in evidence, but for the opinion of a witness as to the cost of an annuity, based on tables not in evidence, on the expense of insurance companies and on an assumed rate of interest which was for the jury themselves to decide. In this connection the jury would be at liberty to consider the fact that the deceased was retired from the Police Department because he suffered arthritis of the spine.

Walrath gave in full a telephone conversation he had with Layne the night of the accident. Appellants move to strike out an answer detailing this conversation, which was overruled. In the brief it is contended that that part of this conversation calculated to limit or restrict the master's liability is entirely inadmissible. That part of the answer objected to in the brief is: *"Do you think it would be all right to take a piece of equipment, and I said, Absolutely no, that's against the company ruling".*

*Julian Goldman Stores v. Bugg,* 156 Md. 36, 143 A. 589, 590, is a malicious prosecution case. Brodsky was general manager for the stores and he resorted to an attachment suit against Bugg for the purpose of collecting money that Bugg owed the stores. In that case the defendant, Goldman Stores, attempted to show that it had denied its agent, Brodsky, any authority to resort to such litigation. Chief Judge Bond said: "This court

is of opinion that the evidence referred to in both exceptions was properly excluded on one and the same ground: That the employer's liability or lack of liability to Bugg for Brodsky's act is to be ascertained from the scope of Brodsky's employment, without reference to such a limitation imposed by the employer."

We have already said that Layne was within the scope of his employment and that his act in using tractor No. 55 was incident to that employment. We think that that part of the testimony of Walrath which we have italicized was inadmissible, but as the objection was general and not specific the ruling of the court was correct. *Baltimore & Y. T. Road v. Leonhardt*, 66 Md. 70, at page 79, 5 A. 346.

> *Judgment in each case reversed, with costs to appellants, and cases remanded for a new trial.*