MARTIN FURNITURE CORPORATION *v.* YOST,
ET AL.; BUETTNER *v.* MARTIN FURNITURE
CORPORATION

[No. 305, September Term, 1966.]

*Decided June 6, 1967.*

*Motion for reargument filed on July 6, 1967; denied July 13, 1967.*

44

The cause was argued before HAMMOND, C. J., and MAR-
BURY, OPPENHEIMER, McWILLIAMS and FINAN, JJ.

*William W. Cahill, Jr.*, with whom were *Robert D. Klages*
and *Weinberg & Green* on the brief for Martin Furniture Corp.,
one of appellants; *James H. Cook* and *Harris James George*,
with whom were *Cook, Mudd & Howard* on the brief for John
Franklin Buettner, other appellant.

*William W. Cahill, Jr.*, with whom were *Weinberg & Green*
on the brief for Martin Furniture Corp., part of appellees; *Je-
rome A. Dashner* for Robert C. Yost, et al., other appellees.

McWILLIAMS, J., delivered the opinion of the Court.

A middle-aged foursome consisting of John Franklin Buett-
ner (Buettner), Betty Jaskulski (Betty), Robert C. Yost
(Yost) and Theresa, his wife (Mrs. Yost), went to a dance
on Saturday, 25 March 1962, at a union hall in East Baltimore.
On their way home, Buettner, in whose car they were riding,
collided with a truck owned by Truck Rental Co. and leased
to Martin Furniture Corp. (Martin). All were injured in some
degree. Charles J. Douglas (Douglas), an employee of Martin,
was the driver of the truck.

Betty and her husband [1] sued Martin and Douglas. The Yosts also sued Martin and Douglas. In each case Martin made Buettner a third party defendant. Buettner did not file a cross-claim in either suit. The cases were tried together before Judge Menchine, without a jury. He found for Betty and the Yosts against Martin and for Martin against Buettner in the third party proceedings. Both Martin and Buettner have appealed.

The Yosts liked "to dance more than anything." Buettner, Mrs. Yost's bachelor brother, shared their enthusiasm for dancing. Having made plans to attend the dance Buettner bought the tickets. It was arranged that they would meet at the Yosts' house and go to the hall in his car. He was to bring Betty whom he had been seeing regularly. The Yosts, however, had not met her. He told Betty to meet him at the Sportman's Bar around 7:00 P.M. He got there a little before she did and when she came in they had a glass of draft beer. It was about 8:00 P.M. when they arrived at his sister's home. They "sat and talked for a half hour or more." No drinks were served. They left at about 8:45 P.M. and drove directly to the hall, arriving there shortly after 9:00 P.M.

They went to the table designated on their tickets which they shared with several other couples. On each table were small "Coca-Cola" glasses and pitchers of draft beer which were replenished by waitresses as the evening wore on. In addition to the pretzels and potato chips on the table food was served between 11 and 12 o'clock. Betty said it consisted of "baked beans and roast beef" and that all of them ate some of it. She drank 4 or 5 glasses of beer and she guessed Buettner drank 6 or 7. He said he might have had that many. Yost had 6 to 8 glasses of beer. Mrs. Yost thought she had 3 or 4. None of them drank anything but draft beer. Their dancing seems to have been indefatigable as well as enthusiastic.

After the dance, a little after 1 o'clock, they went to Stetka's Bar on Eastern Avenue where another of Mrs. Yost's brothers was one of the bartenders. Stetka's was about to close when they arrived so they each had a small beer and started for home,

---

1. The Jaskulskis separated several months after the accident. The husband withdrew from the action before trial.

shortly before 2 o'clock. Buettner said he was "wide awake" when they left the union hall and no one had expressed any doubts or fears in respect of his ability to drive carefully and safely. Asked, on cross-examination, if she was intoxicated when they left Stetka's, Betty said she knew she was not intoxicated and that the others "all acted normal." Mrs. Yost said Buettner "seemed all right to" her and that he was operating his car "good, as well as any other time." Asked if she "cautioned him" at any time during the evening about "the fact that he was drinking beer" she said, "No, it didn't seem no reason to."

After leaving Stetka's Buettner headed east on Eastern Avenue. Betty was beside him. Yost was on the right side of the rear seat; Mrs. Yost was on the left side. His car was a 1958 Ford sedan, powered by a 6 cylinder engine with a 3 speed manual transmission. He thought his brakes and tires were in good condition. They chatted, as they went along, about the party and the people who were there. There was very little traffic. Buettner was going between 30 to 35 miles per hour in an area where the posted limit was 35 miles per hour. None of them noticed anything unusual about his driving. Yost said he drove "just like any other time he drives, perfect."

Where Eastern Avenue passes under North Point Boulevard it is divided into eastbound and westbound lanes by a concrete median strip. East of the underpass the grade rises to the crest of a hill. At this point the eastbound lane is further divided into a "fast" lane next to the median strip, a "slow" lane to the right of the "fast" lane and a "curb" lane to the right of the "slow" lane. The "curb" lane, about 400 feet further east, becomes an exit ramp leading to a shopping center. Just before reaching the crest of the hill Buettner, in the "slow" lane, became aware of a truck moving in the same direction in the "curb" lane. He estimated the speed of the truck to be about 20 to 25 miles per hour. Since he was going 30 to 35 miles per hour he intended to pass the truck. There was no other eastbound traffic near him as he remembers it. Asked if he intended to change lanes before passing he said he could have done so but "it didn't seem like * * * [he] would have to at that time." Suddenly and without any warning to Buettner, the

truck turned to the left. He thought the truck was two to three car lengths away when it turned across his path. He "hit the brakes" but he remembers nothing more.

Neither Betty nor Mrs. Yost was able to recall anything of significance. Yost thought he saw the truck's tail light blink just before the collision. They all said there was nothing unusual about Buettner's driving and their testimony appears to confirm his own statement that he was not exceeding the posted limit.

Corporal Kemmerzell of the Baltimore County Police described the scene of the accident and identified the photographs he had taken. He said the truck, which bore the insignia of "Martin Furniture Company," was perpendicular to the path of travel, facing north, blocking both the "curb" lane and most of the "slow" lane. He found debris about in the middle of the "slow" lane. The outside wheel of the double left rear wheel of the truck had been broken off and was lying amidst the debris between the truck and the front of Buettner's car. The distance between the truck and the front of Buettner's car was found to be about 8 feet. He said he noticed "straight skid marks leading directly" to Buettner's car. He described them as being 132 feet long and "solid" rather than "broken." The damage to the truck was confined to the left rear wheel and the suspension. Only the front of Buettner's car was damaged. Corporal Kemmerzell stated that Buettner's car "didn't strike the rear wheel in regards to following the truck from the rear to the front. It struck the rear wheel from the side, from the left side going toward the right side." Judge Menchine refused to allow the officer to state his opinion of the speed of Buettner's car based on either the skid marks or the damage to the front of his car.

Corporal Schramm, who came to the scene of the accident with Corporal Kemmerzell, said he could not give an estimate of speed based on skid marks or front end damage. Neither he nor Kemmerzell examined Buettner's tires or checked his brakes. In his report he said Buettner was "apparently normal." His testimony, in general, supported Kemmerzell's testimony.

Buettner testified that he "didn't see any signals at all from

[the truck] * * * hand signals, light signals or anything." He said he *thought* he could bring his car, going 30 to 35 miles. per hour, to a complete stop in "about a car length or so."

The plaintiffs-appellees produced, as a part of their case in. chief, the testimony of Ivan Aaronson, the president of Martin. At the time of the accident he was general manager. Asked. what his duties were he said he "did everything * * * [he] ran the store, bought merchandise * * * had control over the organization." He confirmed what had been stipulated as the trial began, that Martin leased the truck from Truck Rental Co. He testified that no one else used the truck and, except for periodic servicing by Truck Rental Co., it was under the complete and exclusive control of Martin.

Douglas began working for Martin, as a helper, about a year before the accident. Six months later the driver quit "and he [Douglas] became the driver." Aaronson said he had "complete authority to hire and fire" Douglas. The truck was used to deliver furniture to customers and for the movement of furniture from one to another of its three stores. The daily movements of the truck were under the supervision of a warehouseman. Deliveries were made to customers anywhere within a hundred mile radius of Baltimore and deliveries were made on the day of the accident in the "North Point Road area." Aaronson said Douglas was authorized to take the truck on that day and that he knew Douglas had it. Douglas reported the accident to Aaronson the following morning. He did not reprimand Douglas then or at any other time. Except for the report to Truck Rental Company, the accident seems not to have been discussed again. Douglas continued to work at the same job and at the same salary, for about two months more when he quit because of some disagreement with Aaronson, entirely unrelated to the accident. We have not been made privy to the reasons why he appears to have fled the realm after leaving Martin's employ. He was returned *non est* in both cases.

Asked what Douglas had been told in respect of his duties. and responsibilities, Aaronson said:

"When we gave him the driver's job, is that what you want to know? That's his responsibility, of course,

to deliver the furniture, pack it, make sure it is delivered to the customer in good shape. The truck, there are certain things that have to be taken care of, the truck. The job, that there is no hitchhikers, that the truck has to be—after he makes deliveries, the truck comes back to the store, and we tell him there is one, two, three spots to park it in, and maybe forty, fifty other things, but at that time there is a lot of things that we discuss with him because we know he is capable of doing it, and we go over what his duties are."

He said also that the use of the truck for personal purposes was forbidden.

## I.

Martin's first and principal contention arises out of the application by the trial judge of a presumption that Douglas was acting within the scope of his employment and his finding that Martin did not rebut that presumption. Martin asserts, and we agree, that where the servant of the *owner* is involved in a collision, there is a reasonable presumption that the servant was acting within the scope of his employment. But, argues Martin, it must first be proved that the operator of the vehicle is the servant of the person sought to be held and, secondly, it must be shown that the person sought to be held is the *owner* of the vehicle. Since it was not the owner of the truck, Martin continues, the presumption that Douglas was acting within the scope of his employment cannot arise. Furthermore, says Martin, the trial judge erroneously applied the definition of "owner," as it appears in Code, Art. 66½, § 2, to the situation here presented. § 2 provides that the "term owner shall include any * * * corporation * * * having the exclusive use * * * [of the vehicle] under contract of purchase, lease * * *." We agree that the statutory definition per se cannot be used to equate lessee with owner within the context of the instant case. *Association of Independent Taxi Operators Inc. v. Kern,* 178 Md. 252, 13 A. 2d 374 (1940).

It should be observed that here we are dealing with two presumptions. The first is that the operator of the vehicle is the servant of its owner; the second, that the servant was acting

within the scope of his employment. We are not aware of any reason why these presumptions cannot be applied independently. In the case at bar, for example, it was unnecessary to make use of the first presumption because Martin admitted that Douglas was its servant. Martin, nevertheless, seems to be saying that there is some occult force inherent in the word "owner" which bars the use of the second presumption unless it is applied in connection with the first presumption, and then only where the operator is the servant of the *owner*.

Why ownership of the truck should be an essential factor in determining whether Douglas was acting within the scope of his employment escapes us. Martin enjoyed all of the benefits of ownership except the holding of title and the burdens flowing therefrom. Douglas surely was no less an employee of Martin merely because Truck Rental held the title. Indeed, assuming Martin had the use of two trucks, one owned and one leased, each alternately driven by Douglas, could it be said that the status of Douglas vis-a-vis Martin and the general public would change each time he shifted from one truck to the other? We think not. *Erdman v. Horkheimer & Co.*, 169 Md. 204, 206, 181 Atl. 221 (1935).

Martin has cited many cases in support of its position. Perhaps it would be more nearly correct to say that they coincide with its position because none of them says or suggests that the two presumptions are interdependent and can be applied only where the master is also the owner. We have not found nor have we been referred to any decision declaring the presumption that the servant was acting within the scope of his employment to be unavailable because the master was not the owner of the vehicle involved in the accident.

*Finney v. Frevel*, 183 Md. 355, 359, 37 A. 2d 923 (1944) is one of a number of the decisions of this Court indicating that the two presumptions are not interdependent. In that case, Judge Collins, for the Court, said:

"As to the negligence of Karl L. Frevel, there was no evidence offered that he was either the driver or owner of the car in collision with the station wagon. Ownership and operation of the car, however, are al-

leged in the declaration to be in Frevel. As the ownership was not denied by him in the next succeeding pleading, for the purpose of this case, ownership is admitted in him. Flack's Code, 1939, Art. 75, Sec. 28, Subsec. 109. Ownership being thus established, a *prima facie* presumption arises that the operator of the vehicle was the servant and agent of the owner. *Pennsylvania R. R. Co. v. Lord,* 159 Md. 518, 526, 151 A. 400; *Gutheridge v. Gorsuch, supra,* 177 Md. 109, 114, 115, 8 A. 2d 885. *A reasonable presumption also arises* that the servant and agent was acting in the scope of his employment and upon the business of the master and this presumption exists until rebutted. *Erdman v. Horkheimer & Co.,* 169 Md. 204, 181 A. 221; *Phipps v. Milligan,* 174 Md. 438, 199 A. 498; *Gutheridge v. Gorsuch, supra."* (Emphasis supplied.)

See also *Penn. R. R. Co. v. Lord,* 159 Md. 518, 526-27, 151 Atl. 400 (1930); *Brown v. Bendix Aviation Corp.* 187 Md. 613, 621-22, 51 A. 2d 292 (1947); *Grier v. Rosenberg,* 213 Md. 248, 252-55, 131 A. 2d 737 (1957).

We see nothing improper in Judge Menchine's utilization of the presumption that Douglas was acting within the scope of his employment and we think the evidence was sufficient to support his finding that the presumption was not rebutted.

## II.

Martin next contends the trial judge was clearly erroneous in holding the appellees had sustained the burden of proving that Douglas was acting within the scope of his employment without the aid of the presumption. What we have said in respect of Martin's first contention makes it unnecessary for us to consider this contention.

## III.

In its final contention Martin says the trial judge erred "in not finding that the appellees assumed the risk or contributed to the cause of the accident." In respect of the assumption of risk aspect of Martin's contention we quote from the trial judge's opinion:

"As to the assumption of risk. The defendant argues with vehemence that the plaintiffs should be denied recovery because they assumed the risk of injury when they entered the Buettner car upon leaving Stetka's Tavern at about 2:00 a.m. The record shows that Buettner had two [one, as we read the record] beers at the Sportsman's Bar, bottles or glasses, indefinite; five or six small glasses of about four ounces at a dance and one beer, a bottle or glass, at Stetka's. All of the plaintiffs admit the ingestion of substantially the same quantity of beer during the course of the six hours, most of which was spent dancing. Food was served about midway of the evening. All denied being under the influence of alcohol, and Buettner was recorded by Corporal Schramm, then acting in the Accident Investigation Division of the Baltimore County Police, as, 'apparently normal,' in his report of the accident. There is not the slightest evidence of driving incapacity except the happening of the accident; no suggestion of bizarre behavior at any time during the evening; nothing in the hospital records to suggest that any of the three victims were affected by alcoholic intake. I find no evidence to permit application of the assumption of risk doctrine in this case."

In our judgment there is sufficient evidence in the record to support Judge Menchine's finding.

Judge Menchine, after discussing at length the question whether Betty and the Yosts were guilty of contributory negligence, concluded:

"Under such circumstances, I cannot find that these passengers should have sensed danger from the manner in which the vehicle was being operated before the collision. At the very most, my mind is in a state of even balance or equipoise upon the subject so I must find that the defendant has failed to meet the burden of persuasion upon the subject."

Since we think there was sufficient evidence to support his finding, we cannot say he was clearly erroneous.

## IV.

We turn now to Buettner's contention that it was error to find him guilty of negligence. In this regard the trial judge said:

> "The evidence establishes, to my satisfaction, that although the movement of Douglas without warning across the path of Buettner was a competent producing cause of the collision without which it could not and would not have occurred, nonetheless, *the excessive speed of Buettner is a contributing cause* because I am persuaded that had his vehicle been traveling at a lawful speed, he could have stopped in time to have avoided the collision. I find, accordingly, that both Douglas and Buettner were negligent, and that the negligence of each was a contributing cause of the injuries." (Emphasis supplied.)

The trial judge explained how he reached the conclusion that Buettner's speed was "excessive," in these words:

> "There is, accordingly, no direct credible evidence of the operation of the vehicle by Buettner at an unlawful speed in this thirty-five mile zone, but it has been held on many occasions that an inference of excessive speed may be drawn from other evidence. Buettner has testified on cross examination that he could stop his vehicle within a car length or so when traveling at thirty to thirty-five miles an hour. As previously stated, I accept as proved that the Buettner vehicle laid down skid marks one hundred and thirty-two feet long. The unsuccessful application of brakes for such a distance justifies the inference of unlawful speed notwithstanding the fact that he was on an incline in the road that led to the point of impact. I draw such inference."

Although he "found that the speed of Buettner was unlawful, that is, that it exceeded thirty-five miles per hour in a zone limited to that speed," he also found that while "it was not possible to fix the actual speed," he could not infer that it was

"an extremely high and dangerous speed." He said "the tire marks indicate a speed greater than thirty-five miles per hour on the basis of Buettner's own estimate of his stopping distance at that speed."

In our judgment the trial judge has attributed more significance to Buettner's estimate of his ability to stop than is justified. Since there is no evidence that Buettner had ever made a trial of his ability to stop within any distance from any speed or that he was aware of the fact that 30 miles per hour is 44 feet per second we must assume that he was simply voicing an erroneous but widely held belief. The trial judge should have rejected as impossible Buettner's estimate that *he* could stop *his* car within a "car length or so." See the cases collected in 10 M.L.E., *Evidence*, § 322.

In these circumstances, then, is the testimony in respect of the "skid marks" sufficient to support a finding of unlawful speed? We think not. In *Shafer v. State*, 171 Md. 506, 509, 189 Atl. 273 (1937) Chief Judge Bond, for the Court, said:

> "Evidence offered to support a contrary explanation, that the collision was caused by negligent driving of Ogden, consists entirely of testimony of marks on the road seen by witnesses arriving at various times after the accident. Reliance upon such evidence alone for judicial determination of movements leading to a collision, and for imposition of a liability for damages, *is beset with dangers,* but there would seem to be no room for doubt that in some cases it might amount to proof of negligence. *Schier v. Wehner*, 116 Md. 553, 555, 82 A. 976; *Opecelo v. Meads*, 152 Md. 29, 38, 135 A. 488; *Anderson v. Lynch*, 232 Mich. 276, 279, 205 N.W. 134; *Amer. Film Co. v. Moye* (C.C.A.) 267 Fed. 419. It would be legally sufficient or insufficient in a particular instance according as it might or might not rise above speculation and conjecture on what had taken place, and so afford the rational basis needed for an adjudication that the defendant's agent was guilty of negligence which produced the accident." (Emphasis supplied.)

In *Finney v. Frevel, supra,* Judge Collins, citing *Shafer, supra,* said:

> "Reliance upon testimony alone of marks upon the road, even though clearly shown to be made by the defendant's car, to establish negligence has never been favored by this Court." *Id.* at 360.

It is true that in some later decisions of the Court, where the facts were different, the statements quoted from *Shafer, supra,* and *Finney, supra,* were distinguished. Cf. *Acme Poultry Corp. v. Melville,* 188 Md. 365, 371-2, 53 A. 2d 1 (1947); *Scott v. James Gibbons Co.,* 192 Md. 319, 330, 64 A. 2d 117 (1949). In the instant case, however, they seem to be both timely and apposite.

Officer Kemmerzell said the "skid marks" were "solid" and "unbroken." In view of his statement that the illumination was "poor" and his admission that he checked neither the brakes nor the tires of Buettner's car one wonders about the accuracy of his characterization and, in the absence of any other information except their length, what conclusions might be drawn therefrom. He said they were 132 feet long. Buettner, who looked at them the next day, said they were 10 to 12 feet long. What Kemmerzell meant by "a double set of straight skid marks" is uncertain. Were there two "skid marks" or four "skid marks?" There is nothing in the record to suggest that the "skid marks" indicate a maximum braking effort by Buettner for 132 feet. One could as easily predicate a moderate braking effort for some part of the distance and a maximum effort for the remainder.

However, accepting Officer Kemmerzell's testimony at its face value, there are too many imponderables in the evidence in respect of the "skid marks" for us to be persuaded that Judge Menchine's finding of a speed in excess of 35 miles per hour but less than "extremely high or dangerous" is anything but pure speculation.

Since, in our judgment, the evidence is insufficient to support a finding of negligence on the part of Buettner it will not be necessary for us to assume that he was negligent and then

·consider whether his negligence could have been a proximate ·cause of the accident.

For the reasons stated the judgments in favor of Betty and the Yosts against Martin will be affirmed. The judgments in favor of Martin against Buettner will be reversed and the cases will be remanded for the entry of judgments in favor of Buettner against Martin for costs. The costs of this appeal will be ·paid by Martin.

> *Judgments in favor of Betty Jaskul-*
> *ski and Robert C. Yost and The-*
> *resa Yost against Martin Furni-*
> *ture Corp. affirmed.*
>
> *Judgments in favor of Martin Furni-*
> *ture Corp. against John Franklin*
> *Buettner reversed and cases re-*
> *manded for the entry of judgments*
> *in favor of John Franklin Buett-*
> *ner against Martin Furniture Corp.*
> *for costs.*
>
> *The costs of this appeal will be paid*
> *by Martin Furniture Corp.*